Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 8, 2006        Decided February 6, 2007

No. 05-3103

UNITED STATES OF AMERICA,
APPELLEE

v.

CLYDE LACY RATTLER, *A/K/A* CLYDE LACY RATIER,
*A/K/A* RUNABOUT,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cr00466-01)

———

*Neil H. Jaffee*, Assistant Federal Public Defender, argued the cause for appellant.  With him on the briefs was *A. J. Kramer*, Federal Public Defender.

*Stratton C. Strand*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Roy W. McLeese III* and *Jeanne M. Hauch*, Assistant U.S. Attorneys.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The question on appeal is whether the district court erred in denying Clyde Lacy Rattler's motion to suppress identification evidence that was the product of photographic and show-up identification procedures. Rattler contends that because the repeated display of his photograph to bank employees increased the danger of misidentification and he stood out in the photo array and show-up, the district court should have suppressed the out-of-court, as well as the tainted in-court, identifications of him and that the erroneous admission of this evidence was not harmless beyond a reasonable doubt. We conclude that, assuming without deciding that the identification procedures were impermissibly suggestive, the identifications were nonetheless sufficiently reliable to preclude a very substantial likelihood of misidentification. The bank employees gave detailed and accurate descriptions of the robber prior to the objected-to identification procedures, and based on one description, a security guard followed Rattler from one bank to another bank whose "bait" money was found on his person when he was arrested. Accordingly, we affirm the judgment of conviction.

## I.

Rattler was indicted and convicted of four counts of violating 18 U.S.C. § 2133(a) for three bank robberies and an attempted robbery that took place in June 2002.

The first robbery occurred on June 4th at a branch of the SunTrust Bank. Bank teller Mary Murray was confronted by a man who threatened to blow up the bank and demanded "large

bills." Murray gave the robber over $3,000.00, and he left the bank. She described the robber within an hour to a Federal Bureau of Investigation ("FBI") agent as a black male with dark skin, approximately 6' tall, weighing approximately 170 pounds, of medium build with short black hair, a black beard with a moustache, and wearing a dark suit jacket, dark shirt, dark pants, and light-colored cowboy boots. Natasha Miller and Charles Neill, two other bank employees, provided like descriptions of the robber within an hour of the robbery. Within two or three days, the FBI agent showed each of these employees photographs of one man from a SunTrust surveillance tape and asked whether they depicted "the person that robbed the bank." On June 21st, Murray saw the robber reenter the bank and when she looked at him he left.

The second robbery occurred on June 14th at another branch of the SunTrust Bank. Bank teller Latosha Conley was confronted by a man who said he wanted her to give him "large bills" or he was going to blow up the bank. Conley gave him approximately $1,900.00, and the man left the bank. Conley provided a description of the robber to the FBI shortly after the robbery that matched the descriptions given by the employees at the other SunTrust branch: black male, approximately 6' 1" tall, slender, medium-length hair with a little gray in need of a haircut, with a moustache and a "straggly beard," and wearing a black blazer or jacket and black or beige striped shirt. Conley also said the robber had dark eyes and was in his late forties. Another bank employee, Stephanie Long, provided a similar description of the robber. Within two or three days, the FBI agent showed each of them separately photographs of one man from the bank's surveillance tapes recorded at the time of the robbery and asked each whether they depicted "the person that robbed the bank." Around this time, Conley saw the robber reenter the bank; when he asked her to wait on him she refused.

The attempted robbery occurred on June 19th at a branch of the Bank of America. A man told bank teller Vera Smith to give him money or he would blow up the bank. Smith did not take him seriously at first and told him to get away from her teller window. When he did not leave, she left her station and told her supervisor there was a man at her window who was demanding money. At this point the man left and the supervisor pushed the alarm. Smith provided a description of the robber within an hour of the robbery that was essentially the same as those given by the SunTrust Bank employees: black male with dark skin, approximately 6' 1" tall, weighing approximately 170 pounds, medium build, 40-45 years old with short black hair, a black beard and a moustache, and wearing a dark suit with a dark shirt, dark pants, and light-colored cowboy boots. Another bank employee, Arlethia Graham, provided a similar description: black male, 6' 2" or 6' 3" tall, slim build, in his forties, some facial hair, along with "some bushy hair," maybe with some gray in it, wearing a dark suit.

On June 21st, Smith saw the robber when he returned to the Bank of America and she alerted a security guard. The security guard followed the robber to a branch of the First Union Bank, the scene of the third robbery. There, the robber demanded money from bank teller Erika Garner and threatened to blow up the bank if she did not give it to him. Garner gave the man about $1,500.00, which included bank "bait" bills. Garner described the robber, approximately twenty minutes later as a black male, dark complexion, approximately 6' 1" to 6' 3" tall, approximately 170 pounds, slim build, in his forties, medium length black head hair with some gray, with a beard and a moustache, and wearing a black suit, a black tee-shirt, with black slacks and dirty-brown hiking boots. Garner also identified Rattler in a show-up outside of the Bank of America branch; Rattler stood between two other black males with facial

hair. When Rattler left the First Union Bank, the Bank of America security guard detained him until he was arrested by an FBI agent. Upon searching Rattler's person, the agent found the "bait" money from the First Union robbery.

During the following two months, an FBI agent presented the bank employees (other than the First Union employees) with a photo-array consisting of six color photographs that had been reproduced on a single sheet of paper. All of the bank employees picked out Rattler's photograph as depicting the robber.

Prior to trial, Rattler filed a motion to suppress the identifications made through the use of the show-up and photo array. He argued that the identification procedures were impermissibly suggestive because Rattler stood out from the other men in the array and that it was unduly suggestive repeatedly to show only Rattler's photograph to the bank employees, initially in bank surveillance tape photographs and again in the photo array. The district court denied the motion to suppress. Although finding that the photographs from the surveillance tapes were suggestive and acknowledging that a show-up is a suggestive procedure, the district court found that the men in the photo array were sufficiently similar in appearance, skin complexion, and hair such that Rattler did not stand out, and that the manner of presenting the array was not suggestive because there was no prompting by the FBI agent in displaying the array.

At trial, the four bank tellers who confronted the robber (Murray, Conley, Smith, and Garner) and two other bank employees (Miller and Long) testified, and all identified Rattler as the bank robber. The jury found Rattler guilty as charged. The district court sentenced Rattler to concurrent terms of 97 months' imprisonment and three years' supervised release on

each count, and ordered him to pay a special assessment of $400.00 and to make restitution of $5,530.00 to SunTrust Bank. Rattler appeals.

**II.**

The long-established standard governing the admissibility of identification evidence is "that of fairness as required by the Due Process Clause of the Fourteenth Amendment." *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977). A court must determine first, whether the identification procedure "was impermissibly suggestive," *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994) (citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)), and if so, second, whether, under the totality of the circumstances, the identification was sufficiently reliable to preclude "a very substantial likelihood of irreparable misidentification," *Manson*, 432 U.S. at 116 (internal quotation marks omitted). With respect to the second part of the test, the Supreme Court has instructed that key factors include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed *the corrupting effect* of the suggestive identification itself.

*Id.* at 114 (emphasis added). We review the district court's legal conclusions *de novo* and its findings of fact for clear error. *See United States v. Pindell*, 336 F.3d 1049, 1052 (D.C. Cir. 2003).

As a threshold matter, the government maintains that Rattler has waived any challenge to the in-court identifications by failing to challenge those identifications in his motion to

suppress. *See* FED. R. CRIM. P. 12(b)(3)(C), (e); *United States v. Sobin*, 56 F.3d 1423, 1427 (D.C. Cir. 1995); *cf. United States v. Weathers*, 186 F.3d 948, 957 (D.C. Cir. 1999). Rattler responds that there has been no waiver because the claim was implicit.

In *United States v. Lawson*, 410 F.3d 735 (D.C. Cir.), *cert. denied*, 126 S. Ct. 779 (2005), this court noted, citing *United States v. Wade*, 388 U.S. 218, 241 (1967), that "[i]f an out-of-court identification is held inadmissible, any subsequent in-court identification by the same witness will be barred, unless the prosecution can show an independent, untainted source of the in-court identification." *Lawson*, 410 F.3d at 739 n.3. In other words, as Rattler argued in moving to suppress, a challenge to "the corrupting effect of the suggestive identification" procedures, *Manson*, 432 U.S. at 114, implicitly challenges in-court identification evidence. Thus, if the district court erred in denying Rattler's motion to suppress the show-up and photo array identifications, then, as the Supreme Court in *Wade* has instructed, the "primary illegality" is established, and, absent evidence showing an independent, untainted source for each identification by a witness, the in-court identifications are the product of "exploitation of that illegality [and not] . . . by means sufficiently distinguishable to be purged of the primary taint." *Wade*, 388 U.S. at 241 (quoting JOHN M. MAGUIRE, EVIDENCE OF GUILT 221 (1959)).

Consistent with the purposes of Rule 12, *see United States v. Mitchell*, 951 F.2d 1291, 1297 (D.C. Cir. 1991), Rattler's motion alerted the district court to legal issues before it. The district court tentatively ruled that there was an independent source for the identifications, but ultimately concluded that the identification procedures did not warrant exclusion of the out-of-court identification evidence. Now in contending that the district court erred in denying his motion to suppress, Rattler

maintains that the identification procedures were impermissibly suggestive, and thus increased the likelihood of misidentification in violation of his due process rights. *See Biggers*, 409 U.S. at 198. As it turns out, we need not definitely resolve the Rule 12 waiver issue.

Rattler's challenge is premised on the acknowledgment by the Supreme Court in *Simmons v. United States*, 390 U.S. 377 (1968), that:

> Even if the police subsequently follow the most correct photographic identification procedures . . . there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. . . . Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.

*Id*. at 383-84. Rattler makes three main arguments.

First, he emphasizes the fact that within days of each of the bank robberies, the FBI agent showed bank employees photographs from each bank's surveillance tapes depicting him and then asked each witness the leading question whether this was the person who robbed the bank. As Rattler notes, the Supreme Court has instructed that "identifications arising from single-photograph displays may be viewed in general with suspicion." *Manson*, 432 U.S. at 116 (citing *Simmons*, 390 U.S.

at 383). This court has concluded that such identifications are "highly suggestive." *Mason v. United States*, 414 F.2d 1176, 1182 (D.C. Cir. 1969). More recently, this court observed that bank surveillance photographs showing only two individuals suspected of robbing a bank were "an arguably suggestive medium." *Lawson*, 410 F.3d at 740. Thus Rattler maintains the identification procedures used with respect to the surveillance photographs unnecessarily suggested his guilt to the bank employees.

Second, Rattler maintains, the suggestivity in showing only his photograph to the bank employees was exacerbated by the fact that the bank employees were shown a photo array in which his photograph stood out. Only Rattler's photograph corresponded to the bank employees' descriptions of the robber as having "[l]ong," "scraggly" facial hair and "bushy," "unke[m]pt," "grown-out" head hair. He makes a similar argument about the show-up: He was the only person having the key physical characteristics that bank teller Garner identified. As Rattler points out, this court has recognized that the suggestivity of a photo array "depends in part upon the relationship between the characteristics a witness is searching for and their distribution in the staged array," *United States v. Hinton*, 631 F.2d 769, 782 n.42 (D.C. Cir. 1980), and that an array is impermissibly suggestive where only the defendant's distinctive hair corresponds to the witness's descriptions, *United States v. Sanders*, 479 F.2d 1193, 1197 (D.C. Cir. 1973); *see also United States v. Eltayib*, 88 F.3d 157, 166-67 (2d Cir. 1996); *United States v. Gidley*, 527 F.2d 1345, 1350-51 (5th Cir. 1976). A relatively small number of photographs in an array heightens the need to examine the suggestivity of irregularities between the subjects in the array. *See United States v. Wiseman*, 172 F.3d 1196, 1209-10 (10th Cir. 1999); *United States v. Sanchez*, 24 F.3d 1259, 1263 (10th Cir. 1994).

Third, Rattler points to the fact that only his photograph was consecutively shown to the bank employees, thereby increasing the danger of misidentification. As this court recognized in *United States v. (Jerome) Washington*, 353 F.3d 42, 45 (D.C. Cir. 2004), the use of consecutive identification procedures "may be impermissibly suggestive where there is only one 'repeat player.'" *Id.*; *see also Foster v. California*, 394 U.S. 440, 443 (1969); *Sanders*, 479 F.2d at 1197-98.

In 1999, the Justice Department published guidelines developed by the Office of Justice Programs for refining investigative practices dealing with eyewitness identifications. EYEWITNESS EVIDENCE: A GUIDE FOR LAW ENFORCEMENT (Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, Oct. 1999); *see also* EYEWITNESS EVIDENCE: A TRAINER'S MANUAL FOR LAW ENFORCEMENT (Nat'l Inst. of Justice, Office of Justice Programs, U.S. Dep't of Justice, Sept. 2003) (together "guidelines"). Although not addressing every identification procedure that Rattler challenges, the guidelines emphasize: (1) the importance of selecting other subjects in arrays and lineups who resemble the suspect in respect to significant features described by the witnesses; (2) the dangers of simultaneous identification procedures, like the six-person photo array used in Rattler's case, that encourage inaccurate relative judgments; and (3) the inherent suggestiveness of identifications in which only one individual is shown to a witness. The guidelines also reference studies documenting concerns about some of the identification procedures used in Rattler's case.[1] In his brief, Rattler references other secondary

---

[1] The appendices to the guidelines cite materials for further reading, including those that have criticized eyewitness identifications where: (1) only a single suspect is shown and show-ups generally, *see* Gary L. Wells et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 LAW & HUM.

11

sources that indicate the lack of a significant correlation between the accuracy of a witness's prior description of a suspect and the accuracy of a later identification, and between a witness's certainty about an identification and the accuracy of that identification.[2]

We need not decide whether the identification procedures used in Rattler's case were impermissibly suggestive, however, because even if they were, we conclude that the identifications were nonetheless sufficiently reliable under the totality of circumstances.

First, each of the bank tellers directly confronted by the robber gave him her focused attention for a period of minutes under good lighting conditions. The SunTrust and the Bank of America tellers viewed the robber from a distance of only a few feet, while the First Union teller observed the robber from a

---

BEHAV. 603, 630-31 (1998); Gary L. Wells et al., *Guidelines for Empirically Assessing the Fairness of a Lineup*, 3 LAW & HUM. BEHAV. 285, 291-92 (1979); (2) only one individual in an array, lineup, or show-up exhibits key traits referenced by a witness, *see* Gary L. Wells et al., *On the Selection of Distractors for Eyewitness Lineups*, 78 J. APPLIED PSYCHOL. 835, 835-44 (1993); and (3) an array has multiple photographs on a single page, *see* Wells et al., *Eyewitness Identification Procedures*, at 613-17, 639-40.

[2] *See, e.g.*, Neil Brewer et al., *The Confidence-Accuracy Relationship in Eyewitness Identification: The Effects of Reflection and Disconfirmation on Correlation and Calibration*, 8 J. EXPERIMENTAL PSYCHOL. 44 (2002); Connie Mayer, *Due Process Challenges to Eyewitness Identification Based on Pretrial Photographic Arrays*, 13 PACE L. REV. 815, 845 (1994); Steven Penrod & Brian Cutler, *Witness Confidence and Witness Accuracy: Assessing Their Forensic Relation*, 1 PSYCH., PUB. POL., & LAW 817, 825 (1995).

distance of three feet and also had observed him waiting in line. The other bank employees (Miller and Long) who testified also had unobstructed views of a man demanding money from the tellers. Except at First Union, the tellers also had the opportunity to observe the robber a second time in the flesh when he returned to their banks.

Second, each of the bank employees who identified Rattler at trial gave detailed descriptions of the robber shortly after each robbery, prior to being asked to make a photographic or show-up identification. The four tellers gave descriptions within an hour of the robberies that were very similar and accurate in terms of complexion, height, weight, age, facial hair, and dress. Although there were some differences in the physical descriptions of the robber, they are insignificant. Even Conley's reference to the robber's pink lips, a characteristic not mentioned by any other bank employee, does not detract from the overall congruence of the bank employees' descriptions of the robber.

Third, the absence of a very substantial likelihood of misidentification is further indicated by the fact that, as a result of teller Smith's identification of the robber to a security guard upon the robber's return to the Bank of America, the security guard followed the man to the First Union Bank and upon his exit, detained him until the FBI arrived. Upon his arrest, this man, Rattler, had First Union's "bait" money on his person. Smith's accurate identification thus led to Rattler being caught red-handed.

Moreover, the tellers also were certain in picking out Rattler's photograph from the array, as was the First Union teller when she saw him in the show-up. Although the certainty factor has been subject to much criticism, *see, e.g.*, *supra* note 2, the Supreme Court has yet to repudiate it. It is true that the array

identifications occurred six to eight weeks after the robberies, but in another instance this court did not find this amount of time to affect significantly the reliability of the identifications where other factors, as here, strongly indicated the accuracy of the identifications. *See Lawson*, 410 F.3d at 739.

Because the totality of circumstances shows that the out-of-court identifications were sufficiently reliable to preclude "a very substantial likelihood of irreparable misidentification," *Simmons*, 390 U.S. at 384; *see Washington*, 12 F.3d at 1134, we hold that the district court did not err in denying Rattler's motion to suppress. Accordingly, we affirm the judgment of conviction.