# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 4, 2018           Decided March 8, 2019

No. 16-3125

UNITED STATES OF AMERICA,
APPELLEE

v.

ROBERT KELSEY, ALSO KNOWN AS TAIWAN KELLSI,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00055-1)

*Mary E. Davis*, appointed by the court, argued the cause and filed the briefs for appellant.

*Christopher M. Davis*, appointed by the court, entered an appearance.

*Lauren R. Bates*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman* and *Michael T. Ambrosino*, Assistant U.S. Attorneys.

Before: HENDERSON and PILLARD, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:   A jury convicted Robert Kelsey of transporting a minor, eleven-year-old S.H., with intent to engage in criminal sexual activity, aggravated sexual abuse of a child, and first-degree child sexual abuse with aggravating circumstances.   Kelsey challenges his conviction on three grounds:   First, he argues that the district court allowed a fact witness to give expert testimony on DNA evidence without having been qualified as an expert, which Kelsey contends prejudicially prevented him from cross-examining the witness about a history of testing errors at the District of Columbia Department of Forensic Sciences.   Second, he argues that the photo array from which S.H. identified him was prejudicially suggestive.   And, third, Kelsey contends that the district court erred in admitting statements Kelsey made to the police, which he says were involuntary.   For the following reasons, we conclude that there was no improper expert testimony, that the photo array was not impermissibly suggestive, and that Kelsey's statements were voluntary.

I.

Kelsey's defense at trial, based primarily on cross-examination of the government's witnesses, was that he was not the person who committed the sexual offenses against S.H. The facts below are largely drawn from the unrebutted testimony of prosecution witnesses.   S.H. and Kelsey met via Instagram.   Kelsey told S.H. that his name was "Kevin" and that he was nineteen years old.   (He was actually twenty-six.) S.H. told him her real name and age, and that she wanted to have sex and get pregnant.   Kelsey replied that he could get her pregnant.   Soon after, they made a plan to meet in person. The morning after they made their plan, on July 25, 2014, Kelsey drove to S.H.'s summer camp in Maryland and told a

counselor that he was S.H.'s cousin. When S.H. said she recognized Kelsey as her cousin, the camp counselor let her leave the camp with Kelsey, who drove S.H. in a black Jeep to his father's house in the District of Columbia. At the house, Kelsey and S.H. went upstairs to a bedroom where Kelsey had sexual intercourse with S.H. Kelsey then dropped S.H. back at camp.

S.H.'s custodial father was at the camp when she returned, and he told the camp to call the police. S.H. then explained to Investigator Nicholas Collins of the Prince George's County Police Department what had happened. She said the man's name was Kevin, described him, and handed Collins her cellphone. S.H. was then taken to the Prince George's hospital, where medical personnel used a sexual assault kit to collect and preserve physical evidence from S.H.'s body.

Collins called "Kevin's" number from S.H.'s phone and Kelsey answered. At that point, Kelsey made the first of a series of exculpatory statements suggesting that his cousin "Kevin," not he, was the person the officer was looking for. Collins and Kelsey then had a series of brief phone conversations over the course of the next day, during which Kelsey said that he would ask Kevin to contact Collins. Five days later, Kelsey told Collins over the phone that he had "some information." J.A. 423. Specifically, he said that he had picked up a girl in Maryland for his cousin Kevin and driven her to D.C. Kelsey, driving a black Jeep Cherokee, met Collins in person to discuss the information Kelsey wanted to report. They met at a 7-Eleven store and drove around, with Officer Collins following in an unmarked car behind Kelsey's Jeep, to look for the place where Kelsey claimed to have dropped off S.H. for Kevin and picked her up a few hours later. Kelsey eventually identified a place about five blocks away from his father's house as the drop-off location. (S.H. later

identified from photographs a specific house as the place where Kelsey had taken her, and the directory in Kelsey's phone listed that same address as his father's.)   The next week, Kelsey repeated essentially the same story about "Kevin" to a friend who knew both Kelsey and S.H.   When that individual testified at Kelsey's trial, she said Kelsey seemed "[a] little nervous [when he spoke to her], like he was . . . putting a story together."   J.A. 564.

Five days after the sexual assault, S.H. identified Kelsey from a photo array.   Collins had interviewed S.H., who described the perpetrator to him.   At their first interview, on the day that she met Kelsey, S.H. described him as black, with light skin and tattoos all over his body, and estimated he was nineteen or twenty years old.   At the second interview (after Collins had met Kelsey in person), Collins asked S.H. about the perpetrator's tattoos, and she told him that the perpetrator had a tattoo on his ear.   Based on those descriptions, Collins selected six photos to show S.H. of "individuals of similar race, age, sex, . . . facial features, facial hair, and skin tone," one of whom was Kelsey.   Appellant's Br. 21-22.   A detective with no knowledge of the case then showed S.H. the photo array to see whether she recognized anyone as her assailant.   S.H. identified Kelsey, signed and dated the back of his photo, and wrote "yes this is him."   J.A. 251.   It took less than four minutes for the officer to show S.H. the photographs and for S.H. to identify the photograph of Kelsey.

Roughly two weeks after the assault, Kelsey gave a recorded statement to the Metropolitan Police Department of the District of Columbia at the police station.   Detective Nicholas Oliver had invited Kelsey there, asking him "if he would be willing to come talk."   J.A. 264-67.   Kelsey agreed to go to the station to talk to Oliver; he arrived at the station on his own in under an hour.   Kelsey was not taken into custody

or put in any kind of restraints, and Detective Oliver emphasized that the door to the interview room was open. Kelsey kept all of his belongings, including his phone, with him during the interview. Detective Oliver told him that he was "free to leave at any time." J.A. 93. Oliver also advised Kelsey of his *Miranda* rights, both orally and in writing, and emphasized that Kelsey was not under arrest. Kelsey then signed a *Miranda* waiver form.

Oliver, aware that Kelsey had a lawyer, asked Kelsey if he was "willing to talk to [Oliver] without" his lawyer present. J.A. 93. Kelsey responded that he "would feel more better with her being present." *Id.* Oliver asked whether he was "saying that [he] want[ed] to stop questioning," to which Kelsey replied that they could "still talk," but that he would feel "more comfortable" if his lawyer were there. *Id.* When Oliver pressed Kelsey for clarification, Kelsey said that he would "answer [Oliver's] questions but certain questions [he'd] rather for [his lawyer] to be around." *Id.* At that point, Oliver told Kelsey that "[i]f there [was] something [he didn't] want to answer, [to] stop it right then and there." *Id.* Kelsey proceeded to answer Oliver's questions. Ten minutes later, Kelsey's lawyer called him on his cellphone and spoke to both Kelsey and Detective Oliver. She told Oliver that Kelsey wanted to leave and Oliver responded that he would "leave that up to" Kelsey and that "[i]f he decides to leave, he's free to go." *Id.* Kelsey did not leave and indeed resumed speaking without any prompting from Oliver, reiterating that he had "no problem helping." *Id.* A few minutes later, his lawyer called him back. Kelsey told her that he was "leaving the station now," spoke to Oliver for a few more minutes, and then left. *Id.* Overall, the substance of Kelsey's statement to Oliver was consistent with what he had told Investigator Collins and the friend who testified at trial—that he had driven his mother's Jeep Cherokee to pick up a girl and drop her off for "Kevin."

Before trial, Kelsey moved to suppress his statements at that interview as involuntary. He also moved to suppress the photo-array identification and any in-court identification by S.H. as unduly suggestive and unreliable. The district court denied both motions.

The government used both the recorded statements and photo identification at trial, as well as an in-court identification of Kelsey by S.H. In addition, it presented DNA evidence against Kelsey, seeking to show that Kelsey's DNA matched DNA taken from S.H.'s sexual assault kit. The government introduced its DNA evidence through eight witnesses, two of whom testified as experts, with the other six speaking to the facts establishing the chain of custody. The key expert witness was Hope Parker, an employee of Bode Technology, a private laboratory, who compared Kelsey's DNA with the male DNA from S.H.'s sexual assault kit. Parker testified to her conclusion that the DNA almost certainly belonged to Kelsey.

Shana Mills, one of the six DNA witnesses not proffered as an expert, testified about processing the DNA swabs from S.H.'s sexual assault kit at the Department of Forensic Sciences. Mills performed the physical work of taking cuttings from the swabs, placing them in test tubes, and loading them into a machine called a genetic analyzer. The genetic analyzer then produced electropherograms—charts that list the alleles present at different locations of a length of DNA. The information from an electropherogram can be analyzed by an expert and compared with samples from known individuals to identify whose DNA is present in an evidence sample. The data that Mills generated was transmitted to the Bode lab, where Parker performed her analysis. Mills also recorded her work in her Report of Examination, which the government provided to Kelsey during discovery.

When Mills was on the stand, the government asked her to compare the information in her report to the information Parker used in her analysis. The questioning apparently aimed to show that the data that Mills produced from the assault kit swabs was the same data that Parker then subjected to DNA matching analysis. According to Mills, the work about which she testified ended when she identified a male DNA profile in the swabs from S.H.'s assault kit. She did not go on to compare that male profile to any known sample—that task was for Parker. After completing the work to pull from the sample the data that Bode needed, Mills did run the male profile she identified through CODIS (the Combined DNA Index System, maintained by the FBI), where it matched with Kelsey's DNA, but that information was not shared with Bode, and neither side sought to introduce testimony about that match.

Kelsey objected to Mills' testimony, arguing that she was testifying as an expert without having been qualified at trial to do so. Specifically, Kelsey asked the court "to strike the testimony of [Mills'] comparisons of her raw data to" the data that Parker used for her analysis. J.A. 595. He also alleged that there had been problems with the Department of Forensic Sciences' procedures for interpreting mixtures of different DNA profiles, and sought to cross-examine Mills about those problems. The government objected to the proposed line of questioning, contending that there had never been problems with the processes about which Mills had testified.

The district court engaged in a lengthy colloquy out of the jury's hearing with counsel on both the expert-qualification and cross-examination issues. During that colloquy, Michael Ambrosino, Special Counsel for DNA and Forensic Evidence Litigation at the United States Attorney's Office, acknowledged that there had been past problems with the way that the District of Columbia's Department of Forensic

Sciences had performed "mixture analysis"—the process of isolating and identifying individual DNA profiles when more than one person's DNA is present in a sample. But Mills was testifying about her "bench work"—the preliminary physical processing of DNA samples—not mixture analysis. When the United States Attorney's Office learned of the Department of Forensic Sciences' mixture-analysis problems, it had hired outside DNA experts to review their bench work as well as their mixture analyses. Those experts concluded that there were no problems with the lab's bench work. As a result, the United States Attorney's Office continued to rely on the Department of Forensic Sciences to perform bench work, but contracted out mixture analysis to companies such as Bode Technology.

Crediting Ambrosino's proffer, the district court held that Mills permissibly testified as a fact witness about the bench work she performed on the sample before Bode Technology did the DNA analysis. In addition, it held that the defense's proposed line of inquiry about the Department of Forensic Sciences' historical problems with mixture analysis was irrelevant, because Mills testified about her bench work, whereas Bode Technology—not Mills or anyone at the Department of Forensic Sciences—performed the mixture analysis introduced at trial through expert witness testimony.

Kelsey did not testify and called only one witness—Detective Oliver—who testified to his investigatory efforts, and confirmed that he videotaped his interview of Kelsey as part of his investigation. After deliberating for approximately forty minutes, the jury convicted Kelsey of transportation of a minor with intent to engage in criminal sexual activity, 18 U.S.C. § 2423(a); aggravated sexual abuse of a child, *id.* § 2241(c); and first-degree child sexual abuse with aggravating

circumstances, D.C. Code §§ 22-3008, 22-3020(a)(1). This appeal followed.

## II.

### A.

The district court did not err in allowing Mills to testify about her lab work without being qualified as an expert, nor did it err in preventing Kelsey from cross-examining Mills about the Department of Forensic Sciences' past problems with mixture analysis. Even if its rulings on those points were erroneous, the errors would have been harmless.

### 1.

The district court's decision to admit or exclude expert testimony is reviewed for abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also United States v. Machado-Erazo*, 901 F.3d 326, 336 (D.C. Cir. 2018). A lay witness may testify to her opinions only insofar as they are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. When a party wishes to introduce expert testimony, it must qualify the witness by establishing "the expert's scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. The party also must show that "the testimony is based on sufficient facts or data; . . . [that it] is the product of reliable principles and methods; and . . . [that] the expert has reliably applied the principles and methods to the facts of the case." *Id.*; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

The district court did not abuse its discretion in allowing Mills to testify as a lay witness. At trial, Kelsey's lawyer argued that Mills should not be permitted to testify about how she "looked at her raw data and compared it to the data of the other people." J.A. 594. The government resisted this characterization of Mills' testimony, arguing that Mills was simply confirming—by comparing the data that she produced to the data that Bode Technology used—that what Bode used was the raw data she had provided. In other words, Mills testified that what Bode "received was the same [as what Mills had] produced." J.A. 636. The record fully supports the district court's conclusion that Mills testified as one of multiple lay witnesses who accounted for the chain of custody and physical processing of the DNA evidence, as distinct from its expert analysis.

Mills tested three swabs from S.H.'s sexual assault kit for the presence of male DNA. The raw data, in the form of electropherograms produced by the genetic analyzer, showed that there was a male DNA profile in the sexual assault kit samples. Mills then forwarded that data to Bode. The United States Attorney's Office's general instructions to the chief of the case work unit at Bode directed Bode to then scrub any interpretations or preliminary conclusions from such material before it was sent to one of Bode's analysts, "so that [the analyst] would be interpreting the data 100 percent on their own." J.A. 630-31. "[T]he only thing that went before the analyst was the raw data." J.A. 631. No information was supplied to Hope Parker, the Bode analyst, that there was a male profile in the DNA, for example, or that the male profile had matched with a person in the CODIS system.

Mills did testify about identifying a male profile in the DNA sample from S.H.'s sexual assault kit—and that required a determination whether more than one person's DNA was

present in the sample. But that testimony was not presented to show that any DNA in the sample belonged to Kelsey—or to anyone in particular. Rather, it verified that there was some electropherogram data that was susceptible of mixture analysis and so should be sent to Bode for that purpose. Bode's analyst then did the analysis on the Department of Forensic Sciences' raw data, concluding independently that there was a male profile in the sample and—ultimately—that the male profile matched the sample separately taken from Kelsey. Because Mills was testifying on a factual matter within her own experience—the raw data she produced and that it was the same data as was presented to the outside laboratory—the district court did not abuse its discretion in allowing her to testify as a fact witness, not an expert.

Even if it was error to admit Mills' testimony without qualifying her as an expert, the error was harmless. Non-constitutional error is harmful only if it has a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *accord* Fed. R. Crim. P. 52(a). If a lay witness could have been qualified as an expert had the court so required, that tends to support the conclusion that it was harmless to allow her to testify as a lay witness, especially when the other evidence is overwhelming. *United States v. Smith*, 640 F.3d 358, 366 (D.C. Cir. 2011). Kelsey provided no reason, either at trial or on appeal, why Mills could not have qualified as an expert. Indeed, she presumably could have been, as at the time of her testimony she had already testified as an expert in over thirty-five cases. The only harm Kelsey alleges is that, by allowing Mills to testify without qualifying her as an expert witness, the court prevented him from cross-examining her on the Department of Forensic Sciences' laboratory's recent history of reportedly deficient mixture analyses. But the district court's decision not to permit cross-examination on that topic

did not hinge on whether Mills testified as an expert. The district court understood that whether Mills could give her testimony as a layperson or needed to be qualified as an expert was a "different issue" from whether there were any laboratory-specific quality concerns about the type of work about which Mills was testifying. J.A. 637. In other words, the district court's decision on the cross-examination issue was independent of its decision that Mills gave lay rather than expert testimony—meaning that the inability to cross-examine Mills about the laboratory cannot be a "harm" caused by the district court's expert-testimony decision.

2.

The district court's decision to preclude a line of inquiry on cross-examination is also reviewed for abuse of discretion. *United States v. Vega*, 826 F.3d 514, 542 (D.C. Cir. 2016) (per curiam).

The district court did not abuse its discretion in preventing Kelsey from cross-examining Mills on the Department of Forensic Sciences' mixture-analysis problems. The district court—after hearing a lengthy proffer from the United States Attorney's Office—concluded that any such problems were irrelevant to how the jury might weigh and credit Mills' testimony on direct examination. Testimony confirmed that the bench work in this case predated the problems with mixture analysis in the District's lab. The district court found that "the evidence clearly shows that there ultimately were no concerns about the quality of work that the DC lab was doing in reference to what [Mills] testified about," and "the decision to send the work to the private lab had nothing to do with" the lab's bench work. J.A. 637.

The district court further ruled that, if it had permitted the defense's requested cross-examination, the court would also have permitted the government to present the experts who had analyzed the Department of Forensic Sciences' bench work and found it to be acceptable and entirely independent of the kinds of problems the defense sought to probe, and would have permitted Mills to testify about the interpretation she had performed (but had not testified about), which corroborated Bode's interpretation. In other words, with the context the district court said it would have allowed the government to elicit, the ultimate result of the cross-examination Kelsey's counsel sought would not, on balance, have been uniformly positive for Kelsey, but might in fact have had a negative effect on his defense.

There was, in sum, no error and in any event no prejudice to Kelsey from the district court's allowance of Mills' testimony.

## B.

The district court's decision to admit the photo identification was not error and, even if it were, the ample independent evidence identifying Kelsey rendered any such error harmless. A court assessing a challenge to identification evidence under the Due Process Clause must perform a two-step analysis. *United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007). First, the court must determine "whether the identification procedure 'was impermissibly suggestive.'" *Id.* (quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994)). If the procedure was impermissibly suggestive, the court must decide "whether, under the totality of the circumstances," the identification was nonetheless "sufficiently reliable to preclude 'a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Manson v.*

*Brathwaite*, 432 U.S. 98, 116 (1977)). The key factors at the second step are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.* (quoting *Manson*, 432 U.S. at 114). The court must weigh these factors against "the corrupting effect of the suggestive identification itself." *Id.* (quoting *Manson*, 432 U.S. at 114) (emphasis omitted). "We review the district court's legal conclusions *de novo* and its findings of fact for clear error." *Id.*

The photo array was not impermissibly suggestive. The only characteristic that Kelsey claims was suggestive is that his was the only photo showing someone with an ear tattoo; otherwise, the defense agreed, the individuals depicted in the photos were "very, very similar." J.A. 255. But, as the district court observed, Kelsey's ear tattoo is not clearly discernable in the photo shown to S.H. "[W]hile there is some discoloration in the left ear," the court said, "it's not clear . . . exactly what the discoloration is." J.A. 259. According to the district court, it could have been "just a birth mark or . . . a shadow." *Id.* Of course, if only one photo in a photo array has a characteristic distinctive to the defendant, then the array may well be impermissibly suggestive. That is not the situation here, where the distinctive tattoo was barely visible in the photo. Nor did any other aspect of the photo array single out Kelsey. Not only did the array feature six similar-looking individuals, it was administered by someone who did not know the "correct" result and so was in no position to influence S.H. to choose Kelsey over anyone else.

Even assuming the photo array was impermissibly suggestive, the circumstances of S.H.'s identification of

Kelsey's photograph were sufficiently reliable to avoid any "substantial likelihood of irreparable misidentification." *Rattler*, 475 F.3d at 411 (quoting *Manson*, 432 U.S. at 116); *see Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Kelsey says he disagrees, but provides no argument as to why. S.H. had plenty of opportunity to view Kelsey, both on the drive to and from his father's house and at the house itself, where the sexual assault occurred. S.H. and Kelsey were together for several hours during the daylight, under circumstances in which S.H. would naturally have been paying attention to Kelsey and his appearance. Moreover, when presented with the photo array very shortly after she had been with Kelsey, she identified him quickly and with apparent confidence. In response to these indicia of reliability, the defense argues only that S.H.'s youth and the stressful nature of the situation rendered her identification unreliable. There is no basis in this record, however, to conclude that those factors undermined S.H.'s ability to correctly identify Kelsey as the man she met online who picked her up at her summer camp, drove her for 45 minutes each way in daylight to and from his father's house, and took off most of his clothes to have intercourse with her repeatedly while there.

Even if admitting the photo-array evidence had been error, the totality of the other identification evidence presented against Kelsey would have rendered any error in the photo array harmless beyond a reasonable doubt. *See United States v. Washington*, 353 F.3d 42, 45 (D.C. Cir. 2004). Kelsey argues that the error "was not harmless," Appellant's Br. 24, but provides no argument as to why. And in fact there was significant evidence corroborating the photo-array identification. The DNA evidence, for example, strongly supported the conclusion that Kelsey was the perpetrator. Other evidence, like records showing that S.H. called Kelsey's phone, further confirmed that conclusion. In light of

overwhelming evidence identifying Kelsey as the perpetrator, erroneously admitting the photo-array identification would have been harmless.

## C.

The district court also permissibly admitted the video recording of Kelsey's voluntary statement to the police. A defendant's statement may only be admitted at trial to prove his guilt if the statement was voluntarily made. *See Dickerson v. United States*, 530 U.S. 428, 434 (2000). The burden is on the government to establish voluntariness by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). To be voluntary, a statement cannot have been the product of governmental coercion, with coerciveness assessed in light of all the circumstances. *Dickerson*, 530 U.S. at 434 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Relevant factors include, without limitation, the defendant's "age and education, the length of the detention, whether the defendant was advised of his rights, and the nature of the questioning." *United States v. Murdock*, 667 F.3d 1302, 1305-06 (D.C. Cir. 2012). A waiver of *Miranda* rights is "highly probative" of the voluntariness of subsequent statements. *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

The district court correctly found that Kelsey's recorded statement was voluntary. His only argument that it was not is that the detective did not stop questioning Kelsey after he said he would feel better with his lawyer present. On this record, that was not enough to render his ensuing statements involuntary. The interview with Detective Oliver was videotaped. Immediately after Kelsey made the comment about his lawyer, the videotape shows that the detective asked Kelsey for clarification as to whether he wanted to continue speaking. After Kelsey said he was comfortable answering

some questions but not others without his lawyer present, the detective told him that "[i]f there [was] something [he didn't] want to answer, [to] stop it right then and there." J.A. 93. Moreover, nothing else about the interview could be considered coercive. The detective was not the least bit aggressive in content, tone, or body language. Kelsey's own attorney even described the officer "as passive and as polite and nonaggressive as possible." J.A. 282. Kelsey came to the interview of his own volition, was not restrained in any way, and Detective Oliver told him he was free to go at any time. Because Kelsey was not in custody, he was not required to be informed of his *Miranda* rights, but Oliver read him his rights anyway and Kelsey signed a written waiver. Kelsey was allowed to keep his phone and to use it, taking two calls from his attorney over the course of the interview. When Kelsey did decide to wrap up the conversation and leave, the officers did not interfere or seek to dissuade him. The interview itself was less than half an hour long and Kelsey appeared alert and coherent throughout.

\*     \*     \*

For the reasons discussed above, we affirm the district court's judgment of conviction.

*So ordered.*