# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 22-3043**

**September Term, 2022**

FILED ON: JUNE 1, 2023

UNITED STATES OF AMERICA,
          APPELLEE

v.

WILLIAM CALLOWAY,
          APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cr-00053-1)

Before: HENDERSON, KATSAS and WALKER, *Circuit Judges*.

## J U D G M E N T

This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs and oral arguments of the parties. The panel has afforded the issues full consideration and has determined that they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). For the reasons stated below, it is

**ORDERED AND ADJUDGED** that the judgment of the district court be **AFFIRMED**.

\*     \*     \*

William Calloway was charged with unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Following a three-day jury trial, Calloway was found guilty and sentenced to 63 months' imprisonment followed by three years of supervised release. Calloway appeals his conviction on two grounds. First, he contends that the district court violated his rights under the Sixth Amendment's Confrontation Clause by cutting off his attempts to cross-examine a witness who processed the DNA evidence that was used against him. Second, he argues that the district court abused its discretion in admitting evidence of two earlier convictions over his objection. For the reasons that follow, we affirm.

1

I.

In the early morning hours of October 4, 2018, ShotSpotter, an acoustic gunshot detection system located throughout the District of Columbia, detected the sound of gunshots coming from Oxon Run Park in Southeast Washington, D.C. Metropolitan Police Department (MPD) Officer Sean Jamison received a dispatch call informing him of the ShotSpotter notification and, in less than five minutes, he arrived at the park. There, Officer Jamison saw a group of four people standing on a path next to a baseball field. When the group spotted Officer Jamison, one man—later identified as Calloway—walked out of sight and into a wooded area leading to a small creek. After a few seconds, Calloway reemerged from the wooded area, and, with two of his companions, got into a black Lexus and drove off.

Another officer then arrived on the scene and relayed the black Lexus's description to MPD Officer Christopher Clark, who stopped the car about three blocks from the park. Calloway and the other occupants identified themselves and consented to a search of the car and their persons. The police did not recover any contraband and Calloway and his companions were allowed to leave.

The MPD officers returned to the park, where they found seven .45 caliber shell casings lying on the ground where Officer Jamison had seen Calloway and the others standing. MPD dispatched a K-9 unit, which searched the wooded area Calloway had entered and found a .45 caliber handgun lying on the ground on the opposite side of the creek from where Calloway and his companions had been standing.

Shortly thereafter, Edward Shymansky, a crime scene analyst with the D.C. Department of Forensic Sciences (DFS), arrived at the park and collected the gun and casings and transported them to DFS. On October 12, 2018, Catryna Palmer, a forensic evidence analyst with DFS, swabbed the evidence for DNA and packaged and sealed the swabs. The swabs were sent to Signature Science, an independent forensics laboratory located in Texas, for analysis. There, Michelle Bonnette, a forensic DNA analyst, performed a "deconvolution" analysis to determine the possible genotypes comprising the DNA mixtures found on the gun and magazine. She derived a DNA profile from the gun swabs that was a mixture of two individuals, at least one of whom was male, with one "very strong major contributor" (97%) and a "secondary trace contributor" (3%). J.A. 393–94. She derived a DNA profile from the magazine swabs that was a "more complicated" mixture of four individuals, at least one of whom was male, with contributors of 54%, 40%, 4%, and 3%. J.A. 398–99.

More than a year later, in March 2020, a DFS forensic scientist collected a DNA sample from Calloway by administering a buccal swab on his cheek. The buccal swab was forwarded to Signature Science, whereupon Bonnette compared Calloway's DNA to the mixture profiles from the gun and magazine. With respect to the gun, Calloway's profile "aligned with the 97 percent contributor" and Bonnette calculated a "likelihood ratio" of 590 sextillion, meaning that obtaining the specific mixture "is approximately 590 sextillion times more likely if the DNA originated from William Calloway and an unknown, unrelated individual, rather than if the DNA originated from

2

two unknown, unrelated individuals." J.A. 397. With respect to the magazine, Calloway's profile "align[ed] most closely with" the 54% contributor and Bonnette calculated a likelihood ratio of 717 billion. J.A. 400–01. Both likelihood ratios provided "very strong support" for Calloway's inclusion in the mixtures. J.A. 398, 401.

Around this time, DFS was under investigation for mishandling evidence. In 2019, the federal government learned of allegations of misconduct involving DFS personnel in the agency's firearms examination unit (FEU). In consequence, the federal government and the D.C. Office of the Inspector General (OIG) opened investigations into the FEU. The investigations revealed further allegations of misconduct and mismanagement involving the FEU and other DFS subunits. In late 2020, a team of independent forensic experts was retained to conduct an outside audit of DFS. The audit revealed widespread "problems associated with DFS management" that "cast doubt on the reliability of the work product of the entire DFS laboratory." J.A. 133. Based on the audit's conclusions, the American National Standards Institute's National Accreditation Board suspended DFS's accreditation and DFS disbanded the FEU.

The Government planned to call two DFS employees, Shymansky and Palmer, as witnesses in Calloway's case. Because neither had worked in the FEU or was alleged to have been involved in any misconduct, and because both had "performed largely routine tasks during the evidence's chain of custody," J.A. 44, the Government moved in limine to limit defense counsel's cross-examination about the DFS investigations and accreditation loss. The Government agreed that "limited" cross-examination about "potential testimonial bias" was appropriate if Calloway could "establish that one of the DFS witnesses [wa]s aware of" the investigations and accreditation loss but maintained that "[s]uch questioning [sh]ould be limited to the defendant inquiring about whether the witness would be motivated to testify falsely against the defendant." J.A. 49.

The Government filed a second motion in limine to introduce, under Federal Rule of Evidence 404(b), Calloway's 2016 convictions for carrying a pistol without a license and unlawful possession of a firearm by a felon. The Government argued that the convictions were relevant to proving Calloway's intent, knowledge and absence of mistake. The district court granted the Government's Rule 404(b) motion and, at Calloway's request, reserved decision on the DFS motion.

At the trial, the Government called Officer Jamison, Catryna Palmer, Edward Shymansky and Michelle Bonnette as witnesses. On direct examination, the Government asked Palmer if she knew that "DFS had lost its accreditation" and if she was aware of "any investigation" into "specific individuals" at DFS. J.A. 665–66. Palmer responded that, although she knew DFS had lost its accreditation and was aware of the ongoing investigation, she did not know of any investigation into particular individuals. The Government then asked Palmer whether the DFS investigation had affected her testimony or performance in this case, to which she responded "[n]o." J.A. 666.

On cross-examination, defense counsel asked Palmer several more questions about the DFS investigation, including "when DFS lost its accreditation" and "[w]hen [Palmer] first

bec[a]me aware" that "DFS's accreditation might be at risk." J.A. 326–27. Of relevance here, defense counsel asked if "the fact that [DFS's] accreditation was being evaluated" was "something that was discussed by people who worked at DFS." J.A. 327. The Government objected and the district court sustained the objection. Defense counsel then asked if Palmer knew "why DFS lost its accreditation." J.A. 327. The Government again objected and the district court again sustained the objection. Defense counsel argued that "the nature of issues at DFS are [sic] fair" for cross-examination because "the government opened the door to this when they asked the question of whether or not DFS had lost its accreditation." J.A. 328–29. The district court, unpersuaded, again sustained the Government's objection.

On redirect, the Government asked Palmer if the evidence processing unit she served in while analyzing Calloway's case was accredited. Palmer responded that, "[a]t that time we were a brand new unit. We had just gotten started up so we were not accredited." J.A. 333. On re-cross, defense counsel asked Palmer to confirm her unit of the DFS was "not accredited and never sought accreditation." J.A. 337. The district court interjected, stating "[n]o, that is not what [the Government] said. Try that again." J.A. 337. Defense counsel tried to reframe the question but the district court instructed him to "sit down" because he was "not covering things on redirect." J.A. 337.

During the trial, the Government also introduced evidence under Rule 404(b) that Calloway had been convicted of one count of possessing a firearm as a felon and one count of carrying a pistol without a license. Immediately after the Government introduced Calloway's past convictions, the district court instructed the jury that it could consider the convictions only for the "limited purpose" of deciding whether the Government had proven beyond a reasonable doubt that Calloway "intended to possess a firearm" and that "his actions in this case were knowing and on purpose, not by mistake or accident." J.A. 440. The district court counseled the jury "not [to] use the evidence for any other purpose. You may not use th[e] evidence to conclude that the defendant has a bad character or criminal personality." J.A. 441. The Government rested its case.

The defense then called Kevin Bryant, who testified that he, Calloway and two women drove together to Oxon Run Park on October 3, 2018. Bryant testified that he purchased a gun "earlier that day" from "someone off the street" and, unbeknownst to Calloway, put it in the back of his Lexus. J.A. 445–46. When the group arrived at the park, Bryant "got the gun out of the trunk" and carried it into the park so he could "protect" the group in case someone tried to rob them. J.A. 446. He further testified that he fired all of the gun's rounds into the air to "test[]" whether the gun worked, because it was "brand new." J.A. 447. Then, when he saw police lights approaching, he "tossed the gun" across the creek. J.A. 447.

On cross-examination, Bryant testified that he could not remember where he bought the gun or who sold it to him. He also stated that he did not know Calloway had previously been convicted of a felony or that Calloway had been charged in this case until "a couple days" before he testified, when Calloway contacted him and explained that he was "[r]unning out of time" and needed Bryant "to take that gun." J.A. 467, 469. Finally, Bryant testified that Calloway never touched the gun but that the two of them "may [have] touched hands" and Bryant's "palm was

4

sweaty when [he] touched the gun." J.A. 469–70.

The jury found Calloway guilty and, on June 24, 2022, the district court sentenced him to 63 months' imprisonment and three years of supervised release. Calloway filed a timely notice of appeal on June 27, 2022.

II.

A.

Calloway contends that the restrictions the district court imposed on cross-examination violated his Sixth Amendment right to confront the witnesses against him. Specifically, he claims that the district court erred by first allowing the Government to elicit testimony from Palmer that the DFS investigation and loss of accreditation had no effect on her testimony or work and then refusing to allow the defense to probe that issue on cross-examination. Calloway further contends that the district court erred in concluding that the probative value of defense counsel's proposed line of questioning was substantially outweighed by the potential for undue delay or unfair prejudice under Federal Rule of Evidence 403.

The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him," U.S. CONST. amend. VI, including the right to cross-examine the prosecution's witnesses, *United States v. Straker*, 800 F.3d 570, 595 (D.C. Cir. 2015) (per curiam). But the clause "does not require a trial court to permit unlimited cross-examination by defense counsel." *United States v. Hall*, 945 F.3d 507, 513 (D.C. Cir. 2019) (quoting *United States v. Davis*, 127 F.3d 68, 70 (D.C. Cir. 1997)). Rather, a court may limit cross-examination once a defendant has been permitted "a certain threshold level of cross-examination." *United States v. Tucker*, 12 F.4th 804, 822 (D.C. Cir. 2021) (quoting *Hall*, 945 F.3d at 513). "That threshold is satisfied 'so long as defense counsel is able to elicit enough information to allow a discriminating appraisal of a witness's motives and bias.'" *Id.* (quoting *Hall*, 945 F.3d at 513).

Defense counsel was able to elicit enough information to allow for a discriminating appraisal of Palmer's motives and bias. Both the fact of DFS's loss of accreditation and Palmer's awareness of that fact were elicited on direct, as was Palmer's testimony that she was never investigated and did not know of investigations into any particular DFS employees and that the accreditation loss had not affected her testimony or performance in Calloway's case. On cross-examination, defense counsel was permitted to further question Palmer about the DFS investigation and her knowledge of it. In response to defense counsel's questions, for instance, Palmer iterated that she knew of the accreditation loss and stated that she first learned that the lab's accreditation might be at risk "[w]hen it hit the news." J.A. 327.

The district court did not violate Calloway's confrontation right in forbidding additional cross-examination because defense counsel's proposed line of questioning would not have given the jury "a significantly different impression" of Palmer's credibility. *Tucker*, 12 F.4th at 822 (quoting *United States v. Miller*, 738 F.3d 361, 375 (D.C. Cir. 2013)). Although Calloway contends

that, with additional cross-examination, defense counsel could have impeached Palmer's credibility or called into question the reliability of her work at DFS, neither argument is persuasive.

First, it is not clear how defense counsel's proposed line of questioning would have undermined Palmer's testimonial credibility. For one thing, because Palmer was never investigated in connection with alleged institutional misconduct at DFS, she lacked any incentive to testify in a biased manner so as to curry favor with the federal government, which was conducting the investigation. *Cf. United States v. Wilson*, 605 F.3d 985, 1006 (D.C. Cir. 2010) ("[T]he fact that [the witness] was being investigated at all provided th[e] potential motive" to "curry favor with the government."). For another, because Palmer was no longer employed by DFS when she testified, any theory of testimonial bias was especially attenuated. Palmer had no reason either to ingratiate herself with DFS or to fear adverse consequences if she were to testify unfavorably. In short, Calloway offers no reason to believe Palmer testified falsely about her work on his case or her knowledge *vel non* of the problems at DFS.

Second, it is doubtful additional cross-examination would have undermined the reliability of Palmer's work on Calloway's case. The alleged mismanagement at DFS primarily involved firearms and ballistics analysis in the FEU and scientific analyses in other DFS units. *See United States v. Moore*, 589 F. Supp. 3d 87, 92 (D.D.C. 2022). Palmer neither worked in the FEU nor engaged in substantive scientific analysis. Rather, she simply swabbed the gun and magazine for DNA—a routine process lasting "maybe a minute"—and packaged and sealed the swabs to be sent to Signature Science for analysis. J.A. 671. As Palmer noted on redirect, she did not perform any "actual analysis of any swabs that were collected." J.A. 332. Palmer's largely ministerial function was thus far afield from the alleged misconduct at DFS and further cross-examination about that misconduct would have had no probative value in assessing the reliability of the Government's evidence. *See Moore*, 589 F. Supp. 3d at 92 ("[I]t is far from clear that evidence relating to the alleged misconduct at DFS is at all probative" of the credibility of DFS witnesses whose roles "largely involved routine evidence collection, as opposed to actual testing."); *see also United States v. Kelsey*, 917 F.3d 740, 749 (D.C. Cir. 2019) ("The district court did not abuse its discretion in preventing [the defendant] from cross-examining [the witness] on the [DFS's] "mixture-analysis problems" because there was no evidence the problems affected "the bench work in this case."). Accordingly, the district court did not abuse its discretion in concluding that defense counsel's proposed line of questioning would not have given the jury "a significantly different impression" of Palmer's credibility. *Tucker*, 12 F.4th at 822 (quoting *Miller*, 738 F.3d at 375).

Nor did the district court abuse its discretion in concluding under Rule 403 that the minimal probative value of defense counsel's proposed line of questioning was substantially outweighed by the danger of unfair prejudice. First, it would have been unfairly prejudicial to allow defense counsel to cross-examine Palmer about the misconduct of other DFS employees "when there was no reason to think that [she] had any connection to the misconduct." *Moore*, 589 F. Supp. 3d at 93; *see also United States v. Gonzalez-Vazquez*, 219 F.3d 37, 45 (1st Cir. 2000) ("The district court's unwillingness to allow [the defendant] to question [the witness] about the corruption of other police officers" did not violate the Confrontation Clause because "any testimony tending to

show that . . . other officers were dishonest would not implicate [the witness's] veracity, bias, and motivation."). Second, allowing defense counsel to delve into the details of the accreditation controversy might have given rise to a "trial within a trial" on a collateral issue that only tangentially implicated one witness's credibility, thereby confusing the jury and wasting time. *See United States v. Fonseca*, 435 F.3d 369, 375 (D.C. Cir. 2006) ("[T]rial courts are afforded considerable leeway in deciding whether to admit [collateral] evidence.").

In any event, even if the district court had abused its discretion by restricting defense counsel's attempts to cross-examine Palmer, the error would be harmless beyond a reasonable doubt. *See Wilson*, 605 F.3d at 1011. Bonnette, not Palmer, developed DNA profiles from the gun and magazine swabs and matched the profiles with Calloway's DNA. Palmer performed only the ministerial task of swabbing the gun and magazine and packaging the swabs to be sent to Signature Science for analysis. Palmer, moreover, documented her work in a contemporaneous report that predated the DFS investigations and loss of accreditation, rebutting any inference that the investigations affected her testimony. And even if additional cross-examination could have shown that Palmer's testimony was unreliable in some respect, Calloway fails to explain how his DNA was transferred onto the swabs Bonnette later matched with his DNA profile, if not from the gun and magazine that were collected from the park on the night of October 4, 2018.

B.

Calloway also challenges the district court's decision to admit, under Rules 404(b) and 403, evidence of his past convictions for unlawful possession of a firearm by a felon and for carrying a pistol without a license. Under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b). Like the Federal Rules of Evidence generally, Rule 404(b) is a rule of "inclusion rather than exclusion." *United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). The Rule excludes evidence of the defendant's past bad acts only if the evidence is offered to show the defendant's bad character. *See* FED. R. EVID. 404(b); *see also United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990) ("[U]nder Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character.").

Calloway contends that our decision in *United States v. Linares*, 367 F.3d 941 (D.C. Cir. 2004), compelled the exclusion of his convictions because the evidence that the Government introduced at trial supported only a theory of actual possession, not constructive possession.[1] The Government disagrees, arguing that the evidence presented at trial supported a finding of either

---

[1] Because actual possession is presumptively "knowing," we held in *Linares* that there is ordinarily no need for Rule 404(b) evidence in a case involving evidence of actual possession only. *See Linares*, 367 F.3d at 946.

actual or constructive possession. We need not resolve the dispute because, even if the admission of Calloway's prior convictions was error, it was harmless given the other, overwhelming evidence of Calloway's guilt. *See Linares*, 367 F.3d at 952 ("[W]e must disregard [error] unless it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))). Officer Jamison saw Calloway (and only Calloway) enter the wooded area, the gun was found in the wooded area only minutes later and Calloway's DNA matched with the mixtures obtained from both the gun and the magazine. *See Kelsey*, 917 F.3d at 750–51 (any error in admitting photo-array evidence was harmless because, among other things, "DNA evidence . . . strongly supported the conclusion that [the defendant] was the perpetrator"). Notably, the Government did not rely heavily on the Rule 404(b) evidence. The convictions were admitted at the close of the Government's case, along with a limiting instruction and five other stipulations, and the Government did not mention the convictions during its closing argument, thereby "mitigating any negative effect" their introduction may have had, *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000).

*Affirmed*.

This disposition is unpublished. *See* D.C. CIR. R. 36(d). The Clerk will withhold the mandate until seven days after any timely petition for rehearing or rehearing en banc is resolved. *See* FED. R. APP. P. 41(b); D.C. CIR. R. 41(a)(1).

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/
Daniel J. Reidy
Deputy Clerk